UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ROBERT BISGEIER,

       Plaintiff,

v.                                    Case No. 07-13625
                                        Honorable Patrick J. Duggan

MICHIGAN DEPARTMENT OF
CORRECTIONS, CORRECTIONAL
MEDICAL SERVICES, INC., HAROLD
WHITE, PATRICIA L. CARUSO, GEORGE
PRAMSTALLER, D.O., JUDITH HOWZE, D.O.,
BENCY MATHAI, M.D., DR. EDDIE JENKINS,
DR. UMESH VERMA, DR. ROCCO DEMASI,
DR. CRAIG HUTCHINSON, SAVITHRI
KAKANI, P.A., BEVERLY SAINZ, P.A., and
P.A. FILSINGER,

       Defendants.
_____/

## OPINION AND ORDER

At a session of said Court, held in the U.S.
District Courthouse, Eastern District
of Michigan, on May 21, 2009.

PRESENT:   THE HONORABLE PATRICK J. DUGGAN
                   U.S. DISTRICT COURT JUDGE

Plaintiff, a former Michigan Department of Corrections' inmate, filed this action

against Defendants pursuant to state law and 42 U.S.C. § 1983.[1]  In Count I of his

complaint, Plaintiff alleges that, while he was incarcerated at the Parnall Correctional

---

[1]The following defendants have been dismissed pursuant to stipulated orders:
Michigan Department of Corrections, Patricia Caruso, Rocco DeMasi, Harold White,
George Pramstaller, Umesh Verma, Beverly Sainz, and P.A. Filsinger.

Facility, Defendants were deliberately indifferent to his medical needs in violation of the Eighth and Fourteenth Amendments.  In Count II of his complaint, Plaintiff alleges that Defendants' conduct amounted to "gross negligence, willful, reckless and wanton misconduct."  Plaintiff was paroled on December 14, 2006, and he filed his complaint on August 28, 2007.  Plaintiff filed an amended complaint asserting the same claims on January 31, 2008.

Presently before the Court is Defendants' motion for summary judgment pursuant to Federal Rule of Civil Procedure 56(c) and/or motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6).  The Court construes Defendants' pleading as seeking summary judgment with respect to Plaintiff's § 1983 claim and dismissal of his gross negligence claim.  Defendants' motion has been fully briefed.  This Court held a motion hearing on May 11, 2009.

## I.      Preliminary Procedural Issue

Before Plaintiff filed his amended complaint, Defendants had filed motions to dismiss and/or for summary judgment.  Among the arguments raised in these motions were Defendants' claims that (1) some of the conduct alleged in Plaintiff's complaint occurred beyond the applicable limitations period and (2) Plaintiff failed to specifically identify in his complaint which defendant was responsible for each of the various alleged wrongdoings.  This Court held a hearing with respect to Defendants' motions on January 23, 2008.

At the hearing, in response to the second argument set forth above, the Court

2

indicated to Plaintiff's counsel that each defendant was entitled to know exactly what it is they were alleged to have done and when they were alleged to have done it. The Court therefore directed Plaintiff's counsel to file an amended complaint more precisely identifying, as to each defendant, the claim(s) Plaintiff was asserting against the individual and the date(s) when the alleged deliberate indifference occurred.

Two days after the motion hearing, on January 25, 2008, the Court issued an opinion and order granting in part and denying in part Defendants' motions.  (Doc. 54.) With respect to the second of Defendants' arguments set forth above, the Court concluded that any claim based on conduct accruing prior to August 28, 2004, that was not part of a continuing violation, was barred by the applicable statute of limitations.  The Court determined that Plaintiff's allegation that Defendants failed to provide him with a nutritional dietary plan– although first occurring when Plaintiff began his incarceration– constituted a continuing violation.  At the conclusion of the opinion and order, the Court dismissed Defendant Bency Mathai M.D. ("Dr. Mathai") from the action because the only allegations specifically identifying this defendant in Plaintiff's complaint occurred outside the limitations period and were not part of a continuing violation.

Nevertheless, in the amended complaint that Plaintiff subsequently filed on January 31, 2008, he named and set forth allegations against Dr. Mathai.  In this Court's opinion, its direction to Plaintiff's counsel to file an amended complaint precisely identifying the claims against each defendant and when such conduct occurred did not authorize Plaintiff to include a defendant the Court had dismissed.  Dr. Mathai, however,

3

has filed an answer and affirmative answers to Plaintiff's amended complaint.  Thus, despite the previous dismissal of Dr. Mathai, the Court will evaluate the merits of the claims that Plaintiff asserts against him in the amended complaint.

## II.    Applicable Standards

To survive a motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6), the plaintiff must show that his complaint alleges facts which, if proved, would entitle him to relief.  *First Am. Title Co. v. DeVaugh*, 480 F.3d 438, 443 (6th Cir. 2007). "A complaint must contain either direct or inferential allegations with respect to all material elements necessary to sustain a recovery under some viable legal theory." *Weiner v. Klais & Co.*, 108 F.3d 86, 88 (6th Cir. 1997).  Reviewing a motion to dismiss ". . . the Court must construe the complaint in the light most favorable to the plaintiff, accept all factual allegations as true, and determine whether the complaint contains 'enough facts to state a claim to relief that is plausible on its face.'"  *Bledsoe v. Community Health Sys.*, 501 F.3d 493, 502 (6th Cir. 2007) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 127 S. Ct 1955, 1974 (2007)).  "Under general pleading standards, the facts alleged in the complaint need not be detailed, although 'a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of a cause of action's elements will not do.'" *Id*. (quoting *Twombly*, 127 S. Ct. at 1964-65).

Pursuant to Federal Rule of Civil Procedure 56(c), summary judgment is appropriate only when there is no genuine issue as to any material fact and the moving

party is entitled to judgment as a matter of law.  *See* Fed. R. Civ. P. 56(c).  The central

inquiry is "whether the evidence presents a sufficient disagreement to require submission

to a jury or whether it is so one-sided that one party must prevail as a matter of law."

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52, 106 S. Ct. 2505, 2512 (1986).

After adequate time for discovery and upon motion, Rule 56(c) mandates summary

judgment against a party who fails to establish the existence of an element essential to

that party's case and on which that party bears the burden of proof at trial.  *See Celotex*

*Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552 (1986).

The movant has an initial burden of showing "the absence of a genuine issue of

material fact."  *Id.* at 323.  Once the movant meets this burden, the non-movant must

come forward with specific facts showing that there is a genuine issue for trial.  *See*

*Matsushita Electric Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S. Ct. 1348,

1356 (1986). To demonstrate a genuine issue, the non-movant must present sufficient

evidence upon which a jury could reasonably find for the non-movant; a "scintilla of

evidence" is insufficient. *See Liberty Lobby*, 477 U.S. at 252, 106 S. Ct. at 2512.  The

court must accept as true the non-movant's evidence and draw "all justifiable inferences"

in the non-movant's favor. *See id.* at 255.

## III.    Factual Background[2]

---

[2]Except where noted, the facts set forth in this section are derived from Plaintiff's
medical records during his incarceration.  (*See* Defs.' Mot. Exs. D, J; Pl.'s Resp. Exs.
B,C.)  The Court referred to the depositions of the various medical providers where it was
unable to decipher their handwritten notes.

On February 17, 2004, Plaintiff underwent radical gastric bypass surgery.  Plaintiff experienced several complications following the surgery, including renal failure, dehydration, malnourishment, anemia, hypokalemia, hypocalcemia, and severe weakness.  Approximately two months later, on April 28, 2004, Plaintiff presented to intake at the Reception and Guidance Center of the Michigan Department of Corrections to serve a sentence of two to twenty years.  Some of Plaintiff's previous medical problems persisted through his intake and he eventually was transferred to Foote Hospital ("Foote").

At Foote, Plaintiff was diagnosed as suffering from malnutrition, dehydration, nausea, and weakness.  Plaintiff was treated and he returned to the Reception and Guidance Center on May 18, 2004.  On May 26, 2004, Plaintiff was transferred to the Parnall Correctional Facility ("Parnall").  The following day, Plaintiff presented to Defendant Physician Assistant Savithri Kakani ("P.A. Kakani").

At this May 27 examination, P.A. Kakani enrolled Plaintiff in multiple chronic care clinics and asked a nurse to contact Plaintiff's bariatric surgeon for information regarding his post-surgical care.  P.A. Kakani directed that Plaintiff have a regular diet with three small, low fat snacks, excluding certain carbohydrates.  She also provided Plaintiff with a Styrofoam cup for water and ordered a diet consult, certain blood work, and follow-up appointments.  P.A. Kakani subsequently ordered certain medications for Plaintiff, including vitamins recommended by the bariatric surgeon's office.

On June 28, 2004, Plaintiff presented to Defendant Bency Mathai, M.D. ("Dr. Mathai") at a chronic care clinic visit.  Plaintiff complained of severe nausea, feeling sick,

6

poor eating and drinking, and malaise.  Dr. Mathai advised Plaintiff to increase his fluid intake and increase his small meals.  She prescribed medications for nausea and allergic rhinitis and left his other prescriptions in place.  Dr. Mathai also ordered a Hepatitis profile and a complete blood count and ordered Plaintiff to return to the clinic in two weeks.

On July 1, 2004, P.A. Kakani renewed Plaintiff's diet order, which included three snacks per day.

On July 3, 2004, Plaintiff returned to the chronic care clinic complaining of fatigue and an inability to eat or drink.  Plaintiff was sent to Foote where he was diagnosed with dehydration and received treatment.  Plaintiff returned to Parnall and presented to P.A. Kakani on July 6, 2004.  P.A. Kakani directed Plaintiff to drink water and to keep track of his fluid intake.  She ordered a follow-up for one week later.

On July 9, 2004, Dr. Mathai ordered a diet for Plaintiff recommended by a dietician and ordered a return visit to health care on July 12, 2004.  Dr. Mathai further ordered that custody transfer Plaintiff's cell to a location closest to the chow hall.

On July 13, 2004, Plaintiff presented to Dr. Mathai, complaining of nausea and dizziness, although indicating that he felt better than earlier visits and was able to keep more food down.  Dr. Mathai assessed Plaintiff as having dehydration with hypotension and she ordered IV fluids.  She additionally ordered three small snacks per day, two cans of Resource nutritional supplement, ice chips, and potassium supplements because his lab results revealed a low potassium level.

7

Plaintiff was taken to the emergency room at Duane Waters Hospital ("DWH") for dehydration, hypokalemia, and a urinary tract infection on July 18, 2004.  The following day, Plaintiff was back at Parnall and saw P.A. Kakani.  Plaintiff informed P.A. Kakani that he felt a little better.  P.A. Kakani ordered that Plaintiff see a medical provider in one week, that his potassium level be checked at that time, and that he continue taking the medications prescribed during his hospitalization.

Before a week passed, however, Plaintiff fell and was transferred to the emergency room at Foote.  P.A. Kakani saw Plaintiff on July 22, 2004, the day after Plaintiff returned from the hospital.  At the time, Plaintiff complained that he was dizzy, kept falling, was unable to stand up, and was unable to keep food down.  Dr. Mathai was consulted and decided to send Plaintiff to DWH.

Plaintiff was hospitalized at DWH from July 22 to November 5, 2004, during which time Defendant Judith Howze, D.O. ("Dr. Howze") oversaw his care.  When Plaintiff arrived on July 22, Dr. Howze diagnosed him with generalized weakness, hypokalemia, dehydration, poor oral intake, insulin dependent diabetes mellitus, and status post-bariatric surgery.  Dr. Howze ordered a diagnostic test, fluid hydration via an IV with a multi-vitamin and trace minerals three times per day, and one potassium chloride tablet per day.  Dr. Howze further ordered "fall precautions," several medications, a regular diet with "QHS" high protein snack, and a dietary consult.

Dr. Howze saw Plaintiff again on July 26, 2004.  At that time, Plaintiff was unable to walk on his own and Dr. Howze recommended physical therapy and occupational

8

therapy.  She ordered additional lab work, additional multivitamins, Imodium for diarrhea, and altered his IV because his lab results showed high sodium.

Dr. Howze re-examined Plaintiff on August 2, 2004.  Plaintiff continued to complain of weakness and numbness in his lower extremities. Dr. Howze therefore requested a neurological consultation.  The consultation was scheduled with Defendant Umesh Verma, M.D. ("Dr. Verma") for August 9, 2004.  Dr. Howze also reviewed Plaintiff's lab results which showed normalization of his sodium and potassium levels and improvement of his magnesium.

On August 4, 2004, Dr. Howze saw Plaintiff again and noted that he was alert and oriented, in no acute discomfort, and continued to receive IV fluid for mild dehydration. Dr. Howze ordered a kidney urinary bladder study, plain radiograph, and repeat urinalysis.  In response to Plaintiff's continued complaint of weakness in his lower extremities, Dr. Howze ordered a lumbosacral spine study.

Plaintiff presented for his neurological consult with Dr. Verma on August 9, 2004. Dr. Verma noted that Plaintiff had lost 170-180 pounds in the six months since his gastric bypass surgery.  She further noted his history of diabetes, complaints of weakness in his lower extremities, and more recent numbness from above the abdomen to his legs.  Dr. Verma ordered blood work to look for nutritional issues and a follow-up in two weeks.

On August 13, 2004, Dr. Howze examined Plaintiff and noted progress in his ambulation.  She ordered a daily exercise program to strengthen Plaintiff's leg muscles and further laboratory tests.  She saw Plaintiff again on August 19, and observed that

Plaintiff was increasing his level of activity.  Dr. Howze therefore ordered continued physical therapy to improve Plaintiff's functional status.

On August 23, 2004, Plaintiff presented for his follow-up neurological examination with Dr. Verma.  Dr. Verma noted that Plaintiff's earlier tests showed low normal levels of Vitamin B-12 and folic acid.  She advised Plaintiff that his symptoms could all be secondary to rapid weigh loss, mal-obstruction, and vitamin deficiency related to his gastric bypass surgery.  She recommended an MRI with cervical and thoracic screen to rule out a spinal cord problem.  She further recommended physical and occupational therapy and replacement vitamins and minerals, including a monthly Vitamin B-12 shot, folic acid, Vitamins A, D, E, and K, Selenium, and Carnitine.

The following day, August 24, Dr. Howze issue a request for the MRI recommended by Dr. Verma.  Dr. Howze additionally altered the check for Plaintiff's blood-sugar level, as his blood sugar now was under control.  Plaintiff had complained of an increased heart rate and changes in his vision; therefore Dr. Howze also ordered an EKG and a visit with the ophthalmology clinic.  Dr. Howze further ordered comprehensive lab work.

On September 15, 2004, Plaintiff presented to Dr. Howze with complaints of dizziness following a shower and swelling in his right leg.  Dr. Howze diagnosed Plaintiff as being hypotensive, which she determined was due to inadequate fluid intake.  Plaintiff agreed to increase his intake of fluids.  Dr. Howze determined that Plaintiff's neurological condition was grossly intact and non-focal and noted that he was scheduled for an MRI

10

the following week. Dr. Howze subsequently reviewed the results of Plaintiff's EKG which showed no abnormalities.

Dr. Howze examined Plaintiff again on September 21 and 23, 2004. She noted improvements to his performance level at the first visit and a normal examination at the second visit. Dr. Howze ordered the continuation of Plaintiff's oral potassium supplement but discontinued his insulin. The MRI recommended by Dr. Verma was performed on September 23, and showed no abnormalities in the thoracic spine.

On September 28, 2004, Plaintiff complained of pain in his lower rib cage on the left side when he took a deep breath. Dr. Howze ordered a chest x-ray and lab work. The x-ray indicated possible pneumonia; however, Dr. Howze waited for the lab results to make a diagnosis. She saw Plaintiff again on October 5. Plaintiff reported no increase in chest pain and denied any fever or cough. Plaintiff stated that he was doing better. Plaintiff's lab results did not indicate an infection and therefore Dr. Howze did not recommend antibiotics. Dr. Howze ordered another chest x-ray on October 4, which showed no change. A third x-ray on October 27, which Dr. Howze had recommended on October 25, came back "normal," indicating to her that the condition causing fluid in Plaintiff's lung was resolving.

In the interim, Dr. Verma had re-examined Plaintiff on October 11, 2004. Plaintiff reported feeling better and improvement in his ability to walk independently. Dr. Verma noted that Plaintiff's strength had improved and was almost normal in all four extremities.

Dr. Howze discharged Plaintiff on November 5, 2004. In her discharge notes, Dr.

11

Howze noted that Plaintiff now was able to tolerate a regular diet and ambulate with a walker and that his left-sided chest pain and lower extremity numbness had been resolved. Prior to Plaintiff's discharge, Dr. Howze discussed his case and condition with Dr. Mathai and provided discharge orders, including the administration of various vitamins and minerals. Plaintiff was scheduled to be seen by the medical staff at Parnall upon his return and laboratory tests were ordered for completion at that time. He also was scheduled for a follow-up visit with Dr. Verma on December 6 and for a pulmonary consultation on November 17.

At the pulmonary consultation on November 17, Robert Albertson, M.D. ("Dr. Albertson") examined Plaintiff. Dr. Albertson found Plaintiff's lungs to be clear and normal. Plaintiff indicated that his chest pain had been resolved and that he had some swelling in his lower extremities that had improved as well. Dr. Albertson recommended no further work-up.

On December 1, 2004, P.A. Kakani examined Plaintiff in response to his complaints of swelling in his right leg. P.A. Kakani decided to send Plaintiff to Foote for evaluation for a possible Deep Venous Thrombosis ("DVT"). A doctor at Foote diagnosed a DVT and started Plaintiff on two anti-coagulant medications. On December 2, P.A. Kakani saw Plaintiff back at Parnall and noted the two medications to treat the DVT. She also ordered various additional medications and vitamins and requested Plaintiff's medical record from Foote. Because Plaintiff no longer suffered from high blood pressure or diabetes, she discontinued his enrollment in the chronic care clinics that

12

treated those conditions.  Based on Plaintiff's lab results, P.A. Kakani stopped one of the anti-coagulant medications that Plaintiff was taking for the DVT and ordered follow-up lab work to assess the impact of discontinuing the medication.  She also ordered a follow-up examination for December 10, 2004.

Thereafter and through January 3, 2005, Plaintiff was treated by health care professionals other than Defendants.  During this time period, Plaintiff was hospitalized again at Foote and was diagnosed with anemia, malnutrition, and pneumonia.  Plaintiff was discharged from Foote on January 4, 2005.  On the same date, P.A. Kakani ordered medications, vitamins, and minerals for Plaintiff and certain blood work.  She also scheduled Plaintiff to return to the clinic on January 18, 2005.  Plaintiff failed to show up for the scheduled follow-up appointment and P.A. Kakani rescheduled the appointment for February 1, 2005.

At the February 1 appointment, P.A. Kakani noted Plaintiff's previous ailments and overall improvements.  P.A. Kakani did note that Plaintiff's lower leg still was swollen, but she found it improved in comparison to her previous examinations.  She ordered a chest x-ray to check Plaintiff's previous possible pneumonia and a follow-up in one month regarding Plaintiff's anemia.  P.A. Kakani also ordered protein snacks and a number of vitamins, minerals, and medications for Plaintiff.

Plaintiff's follow-up appointment with P.A. Kakani occurred on March 1.[3]  P.A.

---

[3]In his amended complaint, Plaintiff alleges that Dr. Mathai also participated in the March 1 examination.  (Am. Compl. ¶ 40.)  Plaintiff claims in his response to Defendants'

Kakani noted that Plaintiff's hemoglobin had not dropped since the previous test and she planned for follow-up lab work.  During her examination, P.A. Kakani noted an incisional hernia.  However, after examining the hernia, she determined that it was not twisted and did not otherwise pose a danger to Plaintiff.  P.A. Kakani did become concerned during her examination that Plaintiff had a mass in his kidneys.  A CT scan at Foote was ordered, which showed a non-cancerous cyst.

On March 29, 2005, Plaintiff returned to see P.A. Kakani with complaints of neuropathy, pain in his feet and hernia, and dizziness.  Plaintiff requested a "handicap chow" and, when P.A. Kakani declined his request, he became angry and left the clinic. P.A. Kakani nevertheless ordered lab work and further follow-up.

Two days later, Plaintiff returned to see P.A. Kakani and P.A. Kakani completed her examination.  According to P.A. Kakani's examination notes, Plaintiff did not voice any complaints and the examination produced normal results.   P.A. Kakani examined Plaintiff for the last time on April 29, 2005.

At the April 29 examination, P.A. Kakani again noted some swelling in Plaintiff's right leg but noted that it was improved since his DVT.  Because the last lab work indicated that Plaintiff's hemoglobin had dropped, P.A. Kakani ordered that his Vitamin B-12 and Iron be increased.  She also ordered additional medications and vitamins for Plaintiff.

─────────────────

summary judgment motion that, when P.A. Kakani discovered his hernia, Dr. Mathai indicated that no treatment was to be performed.  (Pl.'s Resp. Br. at 23.)

14

Plaintiff was next seen by Defendant Eddie Jenkins, M.D. ("Dr. Jenkins") on August 18, 2005. Dr. Jenkins noted that Plaintiff remained anemic but that his hemoglobin had remained stable. Dr. Jenkins also indicated that Plaintiff had an electrolyte imbalance, vitamin deficiency, swelling in his right leg, and a hernia that was not strangulated and was reducible. Dr. Jenkins planned to monitor Plaintiff's electrolytes and B-12 level and ordered a follow-up in one month. Dr. Jenkins also stopped the remaining anti-coagulant medication prescribed to Plaintiff for his earlier DVT, as Plaintiff had been taking it since December 2004 and typical treatment of an initial DVT involves treating with the drug for between three and six months.

In August and September 2005, Dr. Jenkins reviewed blood work lab results for Plaintiff. On September 12, 2005, he treated Plaintiff for a rash on his upper buttocks, chronic gas, and a request for a lunchtime snack. Dr. Jenkins denied Plaintiff's request for the additional snack because he determined that Plaintiff's weight had stabilized and therefore the snack was unnecessary.

On January 24, 2006, Dr. Jenkins saw Plaintiff for a scheduled follow-up appointment regarding his hernia. Dr. Jenkins did not detect a change in the hernia, although Plaintiff had started complaining of pain in the area. Dr. Jenkins found Plaintiff's pain not objectively verifiable on examination; nevertheless, he ordered no heavy lifting or straining.

Plaintiff was seen at the health clinic by another medical provider on February 28, 2005, for complaints of leg pain associated with swelling of his right leg and both feet

and hernia irritation.  Plaintiff indicated that his leg pain was moderate, was improving steadily since onset, was aggravated by activity, and relieved by rest.  Plaintiff reported his hernia pain as mild but worsening gradually.  In a journal in which Plaintiff recorded his medical issues and treatment during his incarceration, Plaintiff indicated that his hernia was causing him "some pain when I cough and sneeze."  (Pl.'s Resp. Ex. O at 5.)

On May 31, 2006, Plaintiff presented to Defendant Physician Assistant Beverly Sainz ("P.A. Sainz) complaining of leg cramps, allergy symptoms, and abdominal pain secondary to his hernia.  P.A. Sainz palpated the hernia and found no masses and that it was reducible.  She prescribed certain medications, provided Plaintiff with an abdominal binder, and ordered three high protein snacks and a dietary referral.

In August 2006, Plaintiff's blood work showed improvements in his hemoglobin and red blood cell count.  On September 11, 2006, Plaintiff was seen by Defendant Physician Assistant Kent Filsinger ("P.A. Filsinger") due to his complaints of mild pain associated with his hernia.  P.A. Filsinger noted that Plaintiff was wearing a binder and discussed the need for Plaintiff to kite Dr. Jenkins for the latter to evaluate the need for hernia surgery.  Apparently Plaintiff never kited Dr. Jenkins for surgery.

P.A. Filsinger treated Plaintiff again on November 18, 2006, at which time Plaintiff complained of increased pain in his right leg.  P.A. Filsinger's examination of Plaintiff proved mostly normal.  Plaintiff informed P.A. Filsinger that he was expecting to be paroled in two weeks.  In the event Plaintiff was not released, P.A. Filsinger scheduled him for a follow-up examination on December 29, 2006.  Plaintiff was released on parol

16

on December 14.

Plaintiff maintains that his hernia only was repaired after he was paroled and that it had grown to the size of a bowling ball by that time.

**IV.     Applicable Law and Analysis**

As indicated earlier, Plaintiff asserts two claims against Defendants: (I) deliberate indifference to his medical needs in violation of the Eighth and Fourteen Amendments pursuant to 42 U.S.C. § 1983; and (II) gross negligence under Michigan law.  At this time, Plaintiff's claims remain pending against the following defendants, only: Dr. Mathai[4], P.A. Kakani, Dr. Jenkins, Dr. Howze, Dr. Hutchinson, and Correctional Medical Services. ("CMS").  *See supra* at n. 1.  As set forth in the preceding section, Dr. Mathai, P.A. Kakani, Dr. Jenkins, and Dr. Howze were assigned to provide medical care to Plaintiff at various times during his incarceration.  CMS employs these individuals as independent contractors to provide managed healthcare and/or medical care to MDOC prisoners.  Dr. Hutchinson is CMS' Senior Regional Medical Director, responsible for selecting, orienting, and mentoring CMS primary care providers in the region.

**A.     42 U.S.C. § 1983**

In Count I of his amended complaint, Plaintiff alleges that Defendants were deliberately indifferent to his medical needs in violation of his Eighth and Fourteenth Amendment rights.  As Plaintiff was a convicted prisoner at the time of the alleged

---

[4]As discussed earlier, this Court believes that it already dismissed Dr. Mathai from this lawsuit.

misconduct, his § 1983 claim is properly premised on the Eighth Amendment only. *Doe v. Sullivan County*, 956 F.2d 545, 556 (6th Cir. 1992) (citing *Whitley v. Albers*, 475 U.S. 312, 327, 106 S. Ct. 1087, 1088 (1986)). The Eighth Amendment prohibits cruel and unusual punishment. U.S. CONST. amend. VIII. In the context of prisoners' medical needs, courts find a violation of the Eighth Amendment only where prison officials are "so deliberately indifferent to the serious medical needs of prisoners as to unnecessarily and wantonly inflict pain." *Horn v. Madison County Fiscal Court*, 22 F.3d 653, 660 (6th Cir. 1994).

An Eighth Amendment deliberate indifference claim consists of objective and subjective components. The objective component requires that the deprivation be "sufficiently serious." *Farmer v. Brennan*, 511 U.S. 825, 834, 114 S. Ct. 1970, 1977 (1994). The subjective component requires the plaintiff to show that the defendants had "a sufficiently culpable state of mind in denying [the plaintiff] medical care." *Blackmore v. Kalamazoo County*, 390 F.3d 890, 895 (6th Cir. 2004) (citing *Farmer*, 511 U.S. at 834, 114 S. Ct. at 1977). "[A] plaintiff must establish that 'the official knows of and disregards an excessive risk to inmate health or safety,' which is to say 'the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.'" *Clark-Murphy v. Foreback*, 439 F.3d 280, 286 (6th Cir. 2006) (quoting *Farmer*, 511 U.S. at 837, 114 S. Ct. at 1979).

In their motion for summary judgment, Defendants contend that Plaintiff lacks evidence to show that they disregarded any of his serious medical needs during his

18

incarceration.  According to Defendants, Plaintiff does not contend that they refused to treat his medical needs; he only takes issue with their medical decisions as to *how* to treat him.  Plaintiff responds that, with respect to his dietary needs, Defendants instituted a dietary plan but when the plan proved insufficient and his condition worsened, no changes were made.  Plaintiff argues that deliberate indifference may be established by showing grossly inadequate care or a decision to take an easier but less effective course of treatment.  (Pl.'s Resp. at 22 (citing *Terrance v. Northville Reg'l Psychiatric Hosp.*, 286 F.3d 834, 843 (6th Cir. 2002).)  Plaintiff also maintains that Defendants did nothing to treat his hernia and pneumonia.

The Court will assume for purposes of deciding Defendants' summary judgment motion that Plaintiff satisfies the objective component of his deliberate indifference claim.  The Court, however, finds that Plaintiff cannot establish the subjective component of his claim.  Based on Plaintiff's medical records, the Court finds no genuine issue of material fact as to whether Defendants disregarded an excessive risk to Plaintiff's health during his incarceration.

First, with respect to Plaintiff's dietary needs, no trier of fact could conclude from the evidence outlined above that Defendants ignored his condition, as Plaintiff asserts. For example, when Plaintiff first arrived at Parnall, P.A. Kakani requested that Plaintiff's bariatric surgeon be contacted for a recommendation as to Plaintiff's post-surgical follow-up care, including a proper diet and vitamin and mineral supplements.  (Defs.' Mot. Ex. D at 823, 826.)  As well, P.A. Kakani ordered a consult with a dietician.  (*Id*. at 846.)

19

Plaintiff's medical records indicate that Defendants repeatedly ordered laboratory work throughout his incarceration to assess whether he was getting sufficient vitamins and minerals. Defendants ordered numerous vitamins, minerals, and dietary supplements for Plaintiff and made adjustments when they believed in their medical judgment that changes were needed. This treatment included Iron and Vitamin B-12 for Plaintiff's anemia. (*See, e.g.*, Defs.' Reply Ex. P.) Similarly, Defendants issued orders to address Plaintiff's insufficient fluid intake.

The medical care provided to treat Plaintiff's dietary problems could in no way be described as "'so cursory as to amount to no treatment at all . . .,'" as the Sixth Circuit described the treatment provided in *Terrance*. 286 F.3d at 843 (quoting *Mandel v. Doe*, 888 F.2d 783, 789 (11th Cir. 1989)). Instead, the undisputed evidence shows that Defendants were attentive to Plaintiff's dietary needs, routinely monitoring his nutritional levels and prescribing medications, vitamins, minerals, and dietary supplements when they judged them to be necessary. Plaintiff simply takes issue with the treatment Defendants provided. However, "a difference of opinion between a prisoner and a doctor over diagnosis or treatment . . . fails to state an Eighth Amendment claim of deliberate indifference to a serious medical need." *Brock v. Crall*, 8 Fed. App'x 439, 440 (6th Cir. 2001) (citing *Westlake v. Lucas*, 537 F.2d 857, 860 n.5 (6th Cir. 1976)). Stated differently, where the dispute is over the adequacy of the treatment a prisoner received, "federal courts are generally reluctant to second guess medical judgments and to constitutionalize claims which sound in state tort law." *Id*. at 441.

20

With respect to his hernia, Plaintiff asserts that he endured pain because Defendants refused to request surgery to repair it. Defendants detected Plaintiff's hernia in early 2005; however, the hernia was not strangulated and was reducible, as it remained during the remainder of his incarceration. (*See, e.g.*, Pl.'s Resp. Ex. C at 95-96; Defs.' Mot. Ex. D at 15, 36.) Plaintiff complained of pain associated with the hernia during an appointment with Dr. Jenkins on January 24, 2006. Dr. Jenkins, however, found Plaintiff's pain not objectively verifiable on examination. On May 31, 2006, in response to Plaintiff's continued complaints of pain, P.A. Sainz provided Plaintiff with an abdominal binder. During an appointment with P.A. Filsinger on September 11, 2006, Plaintiff identified his hernia pain as "mildly painful." (Defs.' Mot. Ex. D at 14-15.) P.A. Filsinger instructed Plaintiff to kite Dr. Jenkins regarding the need for hernia surgery. (*Id.*) However, there is no evidence that Plaintiff ever did so; and there is no indication that Plaintiff complained again at his next visit with P.A. Filsinger on November 28, 2006– two weeks before he was paroled. For the following reasons, Plaintiff cannot show that Defendants' response to his hernia denied him medically necessary care.

Plaintiff asserts that the decision to do nothing about his hernia "is not a medical decision, but rather evidence of a physician simply ignoring the medical needs of a patient." (Pl.'s Resp. at 23.) In fact, however, most of the medical evidence presented indicates that Defendants' "do nothing" approach was the recommended course in Plaintiff's case. (Defs.' Mot. Exs. R ¶ D, S ¶ D at 5.) The Court acknowledges Plaintiff's

21

medical expert's statement during his deposition in this case that hernias require surgery where the patient is "symptomatic and having difficulty with [his or her] life and pain issues and especially if [the patient] had dehydration and problems like that." (Pl.'s Resp. Ex. T at 130). Nevertheless, this demonstrates at most the existence of a difference in medical opinions regarding the proper treatment of a hernia. Defendants' decision to pick one course of treatment over another does not set forth a constitutional violation. "A medical decision . . . does not represent cruel and unusual punishment." *Estelle v. Gamble*, 429 U.S. 97, 107, 97 S. Ct. 285, 293 (1976).

The same is true of Dr. Howze's decision to not treat Plaintiff's pneumonia with antibiotics. First, Plaintiff presents no medical evidence to support his claim that his pneumonia should have been treated with antibiotics. (*See* Pl.'s Resp. at 30-31.) On the other hand, one of Defendants' medical experts, Dr. Kevin Krause, indicates his agreement with Dr. Howze's decision to not administer antibiotics under the circumstances presented in Plaintiff's case. (Defs.' Reply Ex. S ¶ D at 3.) As Defendants further point out, antibiotics treat infections not viruses and either can be the cause of pneumonia. Second, the evidence does not indicate that Dr. Howze simply ignored Plaintiff's pneumonia. She monitored Plaintiff's condition with continuous x-rays until those x-rays came back normal. (Defs.' Mot. Ex. D at 538, 613, 564.) She also referred Plaintiff for a pulmonology consultation. (*Id*. at 416-17.)

With respect to Dr. Hutchinson and CMS, Plaintiff maintains that they are liable under § 1983 because they instituted policies or procedures that encouraged or caused

CMS' employees to provide inmates with inadequate medical care. The Court finds it unnecessary to address whether Dr. Hutchinson and/or CMS instituted policies or procedures causally connected to the denial of necessary medical care for MDOC inmates, as it has concluded that Defendants were not deliberately indifferent to *this* plaintiff's medical needs.

In summary, the Court finds no genuine issue of material fact with respect to whether Defendants were deliberately indifferent to Plaintiff's medical needs. The Court therefore concludes that Defendants are entitled to summary judgment as to Count I of Plaintiff's amended complaint.

**B.   Gross Negligence**

In Count II of his amended complaint, Plaintiff alleges that Defendants conduct in relation to his medical care constituted gross negligence. Defendants assert that Plaintiff fails to state a claim upon which relief can be granted because his claim that Defendants provided inadequate medical care can be asserted in a medical malpractice action, only. The cases cited by Defendants do not hold that a plaintiff can not assert a gross negligence claim against a health care provider. A recent decision from the Sixth Circuit, on the other hand, indicates that such a claim is viable. *See Dominguez v. Corr. Med. Servs.*, 555 F.3d 543 (6th Cir. 2009) (denying summary judgment to a defendant-nurse who provided care to the plaintiff-prisoner on the latter's gross negligence claim because a genuine issue of fact existed as to whether the nurse's alleged grossly negligent conduct was the proximate cause of the plaintiff's injury). For other reasons, however, the Court

23

concludes that Defendants are entitled to summary judgment with respect to Plaintiff's gross negligence claim.

Michigan's Governmental Immunity from Tort Liability Act, Michigan Compiled Law Section 691.1407, defines "gross negligence" as "conduct so reckless as to demonstrate a substantial lack of concern for whether an injury results." Mich. Comp. Laws. § 691.1407(7)(a). The Michigan courts have adopted this definition for gross negligence cases involving defendants who are not governmental employees. *See, e.g., Xu v, Gay*, 257 Mich. App. 263, 269, 668 N.W.2d 166, 170 (2003). For the same reasons discussed with respect to Plaintiff's Eighth Amendment deliberate indifference claim, the Court concludes as a matter of law that Defendants' conduct with respect to Plaintiff's medical care was not "so reckless as to demonstrate a substantial lack of concern for whether an injury [to Plaintiff would] result[]."

**V.    Conclusion**

In summary, the Court finds that no reasonable jury could find on the evidence presented that Defendants were deliberately indifferent to Plaintiff's medical needs during his incarceration. Defendants therefore are entitled to summary judgment with respect to Plaintiff's claim under § 1983 that they violated his Eighth Amendment rights. The Court also finds that Defendants' conduct, as a matter of law, did not amount to gross negligence.

Accordingly,

**IT IS ORDERED**, that Defendants' motion for summary judgment is

24

**GRANTED**.

s/PATRICK J. DUGGAN
UNITED STATES DISTRICT JUDGE

Copies to:
J. Kelly Carley, Esq.
John L. Thurber, Esq.
Ronald W. Chapman, Esq.
David B. Mammel, Esq.
Charles D. Brown, Esq.
Clyde M. Metzger, Esq.